STATE, RESPONDENT, *v.* WAKELY, APPELLANT.

(No. 2,983.)

(Submitted May 11, 1911. Decided May 27, 1911.)

[117 Pac. 95.]

*Criminal Law—Gaming—Information—Sufficiency—Evidence— Cross-examination—New Trial—Misconduct of Jurors—Accomplices—Newly Discovered Evidence.*

Gaming—Information—Sufficiency.
1. An information alleging that accused operated and ran a game of studhorse poker, a game of chance played with cards for money, charges a violation of Revised Codes, section 8416, punishing any person operating or running, as principal, agent, or employee, any game of studhorse poker, the allegation showing that accused was not a player, but was the proprietor, or agent, or employee in charge.

Criminal Law—Harmless Error—Exclusion of Evidence.
2. Where a detective, testifying for the state, stated on cross-examination that he worked for $75 a month and expenses, the refusal to allow him to further state whether he worked for a salary or on a commission was not prejudicial to accused.

Same.
3. Where a detective, testifying for the state on a trial for gambling, stated on cross-examination that he was brought to a town by the county attorney to look up gamblers, the refusal to allow him to answer the further question as to what brought him was not prejudicial to accused.

Same.
4. Refusal to allow a detective, testifying for the state, to testify on cross-examination as to the street and number of his residence in a distant city, or as to what his occupation was before he entered the employ of a detective agency, was not prejudicial to accused.

Cross-examination—Questions Assuming Facts.
5. A question asked a witness on cross-examination, which erroneously assumes that the witness has made a statement in his examination, is properly excluded.

Same—Impeachment of Knowledge.
  6.   Where a detective for the state, on a trial for operating games of chance, testified that he was familiar with the games, that he had seen them played, but had never played them, it was immaterial to inquire how he gained his knowledge of such games.

Criminal Law—Harmless Error—Exclusion of Evidence.
  7.   Where, on a trial for gaming, the evidence showed that two detectives testified for the state, the refusal to allow one of them to state on cross-examination what sign he employed to convey the information to the other that the cards were marked, was not prejudicial to accused, the question merely testing the credibility of the detective.

Same—Witnesses—Interest in Litigation.
  8.   The interest a detective who testifies for the state has in the result of the prosecution is material, and it is proper to ask him whether he is employed on a salary or a commission, and thus to show that his testimony may be influenced by the fact that he will receive extra compensation for testimony securing a conviction.

Same—Cross-examination.
  9.   Where a detective, testifying for the state, stated on cross-examination that the money received from a third person was paid to a detective agency from which he received his compensation, the sustaining of objections to questions, "How much did you draw from [third persons]? Did you turn it into the agency or did you keep it?" was not error.

Same—Cross-examination—Latitude.
  10.   The trial court should allow the utmost latitude in the cross-examination of detectives testifying for the state, and thereby enable the jury to determine the credit to be given to them.

Same—New Trial—Misconduct of Jurors..
  11.   That jurors, during their deliberations, examined a court calendar in the jury-room and discovered that there were two criminal cases against accused for the same offense, and that the argument was advanced by jurors that accused must be guilty because of the two cases, may not be shown by affidavits of jurors, within Revised Codes, section 9350, subdivision 4, authorizing a new trial when the verdict has been decided by lot, or by any means other than a fair expression of opinion of all the jurors; but the misconduct is within subdivision 2, authorizing a new trial when the jury received out of court any evidence, other than that resulting from a view of the premises, and cannot be shown by the jurors themselves.

Same—"Accomplices"—Who are.
  12.   Under the rule that an accomplice must unite in the commission of the crime and must be an associate therein, one participating in a gambling game operated by another in violation of Revised Codes, section 8416, is not guilty of any offense, and, therefore, is not an accomplice within section 9290, providing that a conviction cannot be had on the testimony of an accomplice, unless corroborated.

Same—Appeal—Invited Error.
  13.   Accused, bringing out for the first time a matter on cross-examination, may not ask that the testimony be stricken out.

Same—Evidence—Question for Jury.
  14.   Where a witness testified to a conversation with a bartender of accused, and stated that accused was close enough to hear the conversation, and the witness subsequently stated that he did not talk loud enough to enable accused to hear him, the weight of his testimony on the subject was for the jury, and a motion to strike out the testimony

on the ground that accused did not hear the conversation was properly denied.

Gaming—Evidence—Admissibility.
   15.   On a trial for operating a game of chance, the propriety of allowing a state's witness to testify as to who put up the most money, who lost the most, and who won the most was within the court's discretion.

Criminal Law—New Trial—Newly Discovered Evidence—Diligence.
   16.   An application for a new trial on the ground of newly discovered evidence was properly denied, in the absence of any showing that the presence of the witness was not procurable at the trial at the time a state's witness first mentioned his name, or that any effort had been made to secure the testimony of such witness.

*Appeal from District Court, Ravalli County; Henry L. Myers, Judge.*

WILLIAM WAKELY was convicted of gambling, and appeals from the judgment and an order denying him a new trial. Affirmed.

*Mr. C. S. Wagner,* for Appellant, submitted a brief and argued the cause orally.

The first specification of error is based upon the proposition that the information does not state facts sufficient to constitute a public offense.   The law is directed specifically against one who unlawfully and willfully carries on, opens, conducts, etc., a game of chance, for money, etc., as principal, agent or employee.   The defendant is charged in neither of the capacities enumerated by the statute.   The information should, therefore, be held to be fatally defective.   (*State* v. *Hardwick* (Wash.), 114 Pac. 873; *State* v. *Dennison,* 60 Neb. 157, 82 N. W. 383; *Brazele* v. *State,* 86 Miss. 286, 38 South. 314.)

The court erred in curtailing the cross-examination of the state's witnesses, Dillon and Lewellyn.   Under the legitimate scope of cross-examination, the defendant, without a formal offer, had a right to inquire, and the jury a right to know, whether these witnesses were working as detectives on a commission basis or a straight salary; *i. e.,* getting so much per conviction, or receiving the same pay irrespective of the outcome of any case upon which they might be called upon to testify.   We do not conceive the rule to be that an offer of proof is necessary

to every question to which an objection is interposed, especially where the object sought to be attained is manifest, and the theory of the examination is plain. The interest, bias or motive of a witness in giving testimony in a given cause is certainly relevant to the issue. "Cross-examination on matters either directly in issue or directly relevant to the issue is a matter of right, and its exclusion is error." (*Prout* v. *B. L. & S. Co.*, 77 N. J. L. 719, 73 Atl. 486, 25 L. R. A., n. s., 683; see, also, *Sayres* v. *Allen,* 25 Or. 211, 35 Pac. 254; *Cobban* v. *Hecklen,* 27 Mont. 245, 70 Pac. 805; *State* v. *Howard,* 30 Mont. 518, 77 Pac. 50; *State* v. *Rodgers,* 40 Mont. 248, 106 Pac. 4; *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494; *Territory* v. *Garcia* (N. M.), 110 Pac. 838.) The refusal of the trial court to permit cross-examination on matters relevant to the subject matter of the direct examination was said to be a question of law, and not of discretion in *Campau* v. *Dewey,* 9 Mich. 381; cited in *Prout* v. *B. L. & S. Co.*, 77 N. J. L. 719, 73 Atl. 486, 25 L. R. A., n. s., 684. To the same effect is the case of *City of Florence* v. *Calmet,* 43 Colo. 510, 96 Pac. 183.

In 3 Encyclopedia of Evidence, 349, it is said that anything which tends to show that in the circumstances in which he is placed the witness "has a strong temptation to swear falsely, * * * his interest, whether as employee, * * * reward for conviction," etc., ought not to be withheld from the jury. (See, also, *People* v. *Rice,* 103 Mich. 350, 61 N. W. 540; *People* v. *Worthington,* 105 Cal. 166, 38 Pac. 689.)

Lewellyn and Dillon participated in the game alleged to have been played. They were defendant's accomplices, and the former could, therefore, under section 9290, Revised Codes, not be convicted on their testimony, unless corroborated by other evidence. (See *State* v. *Light,* 17 Or. 358, 21 Pac. 132; *English* v. *State,* 35 Ala. 428; *State* v. *Geddes,* 22 Mont. 82, 55 Pac. 919.)

For misconduct of the jury in taking a court calendar into the jury-room and using its contents as an argument to influence certain of its members, a new trial should be granted, under subdivision 4, section 9350, Revised Codes, for thereby the verdict was reached by "other means than a fair expression on the part

of all the jurors." (See *People* v. *Stokes,* 103 Cal. 193, 42 Am. St. Rep. 102, 37 Pac. 207.)

A new trial should have been granted on the ground of newly discovered evidence, which defendant could not, by the exercise of reasonable diligence, have discovered and produced at the trial.

*Mr. Albert J. Galen,* Attorney General, and *Mr. W. S. Towner,* Assistant Attorney General, submitted a brief in behalf of Respondent. *Mr. Towner* argued the cause orally.

The defendant assigns as error that "the verdict of the jury is contrary to the evidence and the law." It may be admitted that there is a conflict between the witnesses for the state and the witnesses for the defense, but we submit that it is not within the province of the appellate court to determine the credibility of the conflicting evidence. "The presumption is in favor of the verdict, and the appellate court will not interfere if there be material evidence tending to support the verdict; the question of credibility is one for the jurors and not the appellate court." (*State* v. *Byrd,* 41 Mont. 605, 111 Pac. 407; *State* v. *Conway,* 38 Mont. 42, 98 Pac. 654; *State* v. *Ford,* 26 Mont. 1, 66 Pac. 293; *State* v. *Howell,* 26 Mont. 3, 66 Pac. 291; *State* v. *Hurst,* 23 Mont. 484, 54 Pac. 911; *State* v. *Allen,* 23 Mont. 118, 57 Pac. 725.)

The defendant's attempted examination of the state's witnesses was more in the nature of an effort on his part to ridicule them in the eyes of the jury than to fairly bring out the facts and circumstances surrounding the commission of the offense as testified to on direct examination. "It is the right of a witness to be protected from irrelevant, improper or insulting questions; or from harsh or insulting demeanor." (Sec. 8031, Rev. Codes.)

As to none of the assignments in this respect does the brief of the appellant indicate wherein he was prejudiced by the court's rulings. This court will not assume that he was. (*State* v. *Vanella,* 40 Mont. 341, 106 Pac. 364; *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407.)

A new trial on the ground of newly discovered evidence was properly denied. "The defendant is not entitled to a new trial on the ground of surprise in testimony of a witness, where such testimony is immaterial; and the objection as to surprise, made after the verdict, comes too late." (*Bissot* v. *State,* 53 Ind. 408; *Nickens* v. *State,* 55 Ark. 567, 18 S. W. 1045; *State* v. *Chambers,* 43 La. Ann. 1108, 10 South. 247.) "The defendant must apply for a postponement of the trial when the surprise appears." (*Overton* v. *State,* 57 Ark. 60, 20 S. W. 590; *Parker* v. *State,* 81 Ga. 332, 6 S. E. 600; *State* v. *Bottorff,* 82 Ind. 538; *Bryant* v. *State,* 35 Tex. Cr. 394, 33 S. W. 978, 36 S. W. 79.) "A new trial should not be granted in a criminal case for newly discovered evidence which is not so material that it would probably produce a different result." (*People* v. *Sutton,* 73 Cal. 243, 15 Pac. 86; *People* v. *Howard,* 74 Cal. 547, 16 Pac. 394; *People* v. *Demasters,* 109 Cal. 607, 42 Pac. 236.) The very facts, which the appellant claims might be proven by witness Peck were testified to by witnesses Wakely and Carr on the part of the defendant. "A new trial will not be granted for newly discovered evidence which is merely cumulative." (*People* v. *Fong Ah Sing,* 70 Cal. 8, 11 Pac. 323; *People* v. *Sutton,* 73 Cal. 243, 15 Pac. 86; *People* v. *Demasters,* 109 Cal. 607, 42 Pac. 236; *People* v. *O'Brien,* 78 Cal. 41, 20 Pac. 359.) At best the only purpose of the testimony of Peck would be to impeach the witness Lewellyn. "The general rule is that a new trial will not be granted merely for the purpose of admitting cumulative evidence, or to impeach a witness." (*Fletcher* v. *People,* 117 Ill. 184, 7 N. E. 80; *People* v. *Goldenson,* 76 Cal. 328, 19 Pac. 161; *People* v. *Loui Tung,* 90 Cal. 377, 27 Pac. 295.)

MR. JUSTICE SMITH delivered the opinion of the court.

The defendant was charged, by information filed in the district court of Ravalli county, as follows: "That he did unlawfully and willfully carry on, open, and cause to be opened, conduct, and cause to be conducted, operate, and run a game of studhorse poker; the same being a game of chance played with cards, for money, checks, and representatives of value." He was

found guilty by verdict of a jury, and appeals from a judgment of conviction and also from an order denying a motion for a new trial. Section 8416, Revised Codes, under which the defendant was prosecuted, reads, in part, as follows: "Any person who carries on, opens, or causes to be opened, or who conducts or causes to be conducted, or operates, or runs, as principal, agent, or employee, any game of * * * studhorse poker * * * is punishable by a fine," etc.

The first contention of the appellant is that the information does not state facts sufficient to constitute a public offense in that [1] it fails to allege whether he acted as principal, agent, or employee, or that he acted in either capacity. Such an allegation is not necessary. The purpose of the statute is to declare an agent or employee who commits any of the prohibited acts guilty to the same extent as would be the case if he were principal or proprietor, and the allegation that he carried on, opened, conducted, and ran the game is sufficient to show that he was not a mere player, but that he was the proprietor or his agent or employee in charge of the game.

2. It is contended that the court erred in unduly restricting the cross-examination of two of the state's witnesses. The record shows that these two witnesses were what is commonly known as detectives. Their names were Dillon and Lewellen. They both testified that on the night of August 19, 1910, they played a game of studhorse poker in the defendant's saloon at Hamilton; that the defendant and his barkeeper, Carr, both played in the game; that the defendant personally "banked" the game, sold chips representing money values, and took a "rakeoff." The defendant and Carr testified that no such game, or any game, was played in the saloon on the night in question, or at any other time. The following proceedings will illustrate the point sought to be made by the appellant in this assignment of error. Dillon testified on cross-examination: "I am a detective in the employ of the Swain Detective Agency. I have been in the employ of that agency for about two years. Q. Were you working for a salary or commission? (An objection to the question as

incompetent, irrelevant, and immaterial was sustained, and exception noted to the ruling.) Witness continuing: I did not see any subpoena. Mr. McCulloch, the county attorney, sent for me. Q. Where were you when you were sent for? (Objection sustained.) Ravalli county is paying my expenses, suppose. I am being paid $75 a month and my expenses. I lived in Spokane five years. Q. You spent most of your time in Missoula during that time? (Objection sustained.) Q. What brought you here last August? (Objection sustained.) I stayed here sixteen days while I was here last August. I was in the employ of the county of Ravalli at that time. I am in the employ of a detective agency in Spokane. I draw my salary from the detective agency. I am drawing a salary of $75 a month. Ravalli county pays the company. I have been in the employ of the Swain Detective Agency for two years. I have a regular home. I live in Spokane, Wash. Q. What street and number? (Objection sustained.) Q. What was your occupation before you entered the employ of the detective agency? (Objection sustained.) The first studhorse poker I ever played was when I was a kid. I have played it whenever my operations required it. Q. Do you mean to say from the time you were a kid until you entered the employ of the detective agency you didn't play studhorse poker? (Objection sustained.) I am familiar with draw poker, stud poker, black jack, three-card monte, and faro bank. Q. How did you gain your knowledge of three-card monte and faro bank? (Objection sustained.) I revealed to Lewellen the fact that the cards we were playing with that night were marked. Q. Was it a general sign you used that might convey any meaning? (Objection sustained.)"

Lewellen testified on cross-examination: "I never had any subpoena served on me. I came here at the solicitation of the county attorney. I was brought over here by the county attorney in August to look up the gamblers. I was paid by the county. I drew the money from Mr. McCulloch. I have known Mr. Dillon a little over a year. I made his acquaintance in Spokane. He was a detective. I and Dillon came here together. I and Dillon together drew our money from the county, or from

Mr. McCulloch. We drew our money at the same time from Mr. McCulloch. Q. How much did you draw from Mr. McCulloch? (Objection sustained.) Q. Do you draw a salary from the agency you are employed with now? (Objection sustained.) In the trial of this case and in the gathering of evidence for it, I suppose I am in the employ of Ravalli county; I and Mr. Dillon have both been so employed since we first undertook to get evidence in this case. The money is paid to the detective agency, and we are paid by them. The system is that whatever we get out of this we will turn it into the agency, and the agency will pay us; that's the dope. Q. Was that the dope last summer when you drew the money from Mr. McCulloch? A. What do you mean? Q. When Mr. McCulloch paid you the money; what did you do with it? Did you turn it into the agency, or did you keep it? (Objection sustained.) A. I remember talking over with Mr. Carr whether I brought my girls with me from Missoula. Q. What did you tell him? (Objection sustained.)''

The defendant was not prejudiced by the refusal of the court to allow the witness Dillon to answer whether he was working for a salary or on commission, for the reason that he w̶a̶s̶ afterward allowed to testify that he was working for $75 per month and expenses. While it is true that the court refused to allow him to answer the question, ''What brought you here last August?'' we think it sufficiently appears, as testified to later by Lewellen, that they were brought to Hamilton ''by the county attorney to look up the gamblers.'' While the court might very properly have allowed him to testify as to the street and number of his residence in Spokane, we do not regard the fact that he was not permitted to do so as amounting to prejudicial error. The same may be said of the refusal to allow him to answer the question, ''What was your occupation before you entered the employ of the detective agency?''

There was no error in sustaining an objection to the question, ''Do you mean to say that from the time you were a kid until you entered the employ of the detective agency you didn't play studhorse poker?'' The witness had made no such statement. Inquiry might properly have been made as to how often he

had played the game; but we do not understand from the record that there was any refusal to allow such inquiry. We think it was immaterial how he gained his knowledge of three-card [6] monte and faro bank. He testified that he was familiar with those games, but that he had never played them. He said, however, that he had seen them played.

There was no prejudicial error in refusing to allow him to state what sign he employed to convey the information to Lewellen that the cards were marked. This and similar questions were [7] evidently propounded for the purpose of testing his credibility, and, while under the circumstances, full opportunity for cross-examination should have been afforded, still the extent of the inquiry into those minor details was a matter within the discretion of the court, and we find no abuse thereof. We are frank to say, however, that we fail to understand the reason for some of the court's rulings, or how the defendant's right of cross-examination could have been curtailed to any greater extent, without resulting in a reversal of the judgment and the order denying him a new trial.

It was material to inquire what interest, if any, these witnesses had in the result of the prosecution, and to that end it was proper [8] to ask them whether they were employed on salary or commission. The witness Dillon was allowed to state what his arrangement for compensation was, but the questions propounded [9] to Lewellen, "How much did you draw from Mr. McCulloch?" and, "Did you turn it into the agency, or did you keep it?" were not answered, because of objections thereto on the part of the state. Both of these questions might properly have been allowed. Neither, however, reaches the vital matters to which it was evidently the purpose of counsel to direct the attention of the jury, to-wit, whether the testimony of the witness might have been influenced by the consideration that he received extra compensation for furnishing testimony tending to secure a conviction, and what amount he actually received for his services. Perhaps it is not strictly correct to say, as we said in *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407, that the duty devolved upon the defendant to make an offer of proof in the course of

cross-examination; but it must appear in some way that he has suffered prejudice from the court's ruling, and the result is therefore the same. It would have been proper for counsel to have asked Lewellen, as he did Dillon, whether he was working for a salary or on commission; or he might have been asked the direct question what compensation he received for his services. Having testified that the money received from McCulloch was paid to the agency from which the detectives received their compensation, the next and most natural question would have been how much the agency paid the witness. But this particular question was not asked. We shall presume that, had counsel framed his inquiries as above indicated, the learned trial judge would have allowed the witness to answer.

We recognize the duty of trial judges to allow the utmost latitude in cross-examination, especially in cases like this, where the [10] question of the guilt or innocence of a citizen depends entirely upon the credit to be given to witnesses hired to detect violators of the statute; but after a careful study of the record it appears to us that the jury was in possession of sufficient information with regard to these two witnesses to enable them to form a very clear judgment as to whether or not they were entitled to credit. The substantial facts appear in the main to have been brought out. There was no error in refusing to allow Lewellen to state what he told Carr about his girls.

3. In support of his motion for a new trial, the defendant produced the affidavits of four jurors who sat in the case, to the [11] effect that a court calendar was found or produced in the jury-room, showing that there were two criminal cases pending against the defendant for gambling, and that the argument was thereupon advanced by certain jurors that having two cases pending against him he must be guilty; these jurors declared that they believed a verdict of not guilty would have been reached had said calendar not been consulted, and such argument made. But these affidavits cannot be considered. This court held, in *State* v. *Beesskove*, 34 Mont. 41, 85 Pac. 376, that there is but one exception to the general rule prohibiting jurors from impeaching their own verdict, and that is in cases where

it has been decided by lot, or by any means other than a fair expression on the part of all the jurors.   (Rev. Codes, sec. 9350.) But it is argued that the verdict in this case was reached by means other than a fair expression on the part of the jurors, and that therefore they may be heard to impeach it.   Not so.   The facts here presented do not warrant a general inquiry into the meaning of the phrase ''means other than a fair expression on the part of the jurors.''   Any attempt in that direction would be mere speculation at this time, although it is clear that it has some relation to a situation similar to that of deciding by lot. Paragraph 2 of section 9350, Revised Code, *supra,* provides that a new trial may be granted to a convicted defendant ''when the jury has received out of court any evidence other than that resulting from a view of the premises, or any communication, document or paper referring to the case.''   The alleged misconduct of which appellant complains falls within the provisions of this subdivision, but it cannot be shown by the jurors themselves. The law does not undertake to limit or control the arguments by which one juror may convince the mind of another.

4. It is contended that the witnesses Dillon and Lewellen were accomplices of the defendant, and, their testimony being uncorroborated, the conviction cannot stand.   (See Rev. Codes, sec. 9290.)   The case of *State* v. *Light,* 17 Or. 358, 21 Pac. 132, was cited to the point.   In that case, however, it was apparently held that under the Oregon statute all who participated in a game of studhorse poker were *particeps criminis,* and therefore accomplices.   But under our statute the mere player who does not [12] take part in carrying on, opening, or causing to be opened, conducting, or causing to be conducted, operating, or running the prohibited game, as principal, agent, or employee, is guilty of no offense whatsoever.   The statute is plain on this point, and is presumed to express the exact intention of the legislature. Had there been any purpose to punish the player, that body would undoubtedly have so declared.   In order to be an accomplice, the person so charged must unite in the commission of a crime; he must be an associate in crime, a partner or partaker

in guilt. As was tersely stated by the court, in *State* v. *Light,* *supra,* participation in guilt is what makes an accomplice.

5. The record shows that while the witness Dillon was upon the stand he made this statement: "About 8 o'clock in the evening, the bartender told myself and Lewellen to stick around; there would be a little game of poker that evening." Defendant's counsel moved "to strike from the record as hearsay what the bartender told this witness and Lewellen." "Q. Was Mr. Wakely present when that was told you? A. He was. Q. Did he hear it? A. I do not know. Q. Was he close enough to hear it? A. He was close enough to hear it." The court overruled the motion. Witness continuing on cross-examination: "Mr. Carr talked with me and Lewellen about the game. Mr. Wakely was in the house at the time. I think he was near the cigar-case when we talked it over, 4 or 5 o'clock in the afternoon. I was at the bar, at one particular time Wakely was at the cigar-case. There is a screen that separates the bar from the cigar-case. I was not talking loud enough so that people around there could tell what I said; I am not sure that Wakely heard what I said." Defendant's counsel: "Want to have this evidence stricken from the record, because he testified in his direct examination Mr. Wakely was close enough at all times so he could hear everything that was said." This motion was overruled, and the witness continued: "I was not talking loud enough so Mr. Wakely could hear me in by the cigar-case." Defendant's counsel: "Ask to have the testimony stricken from the record, all evidence with reference to ribbing up any game." Court: "It was brought out on cross-examination. The county attorney didn't bring it out. (Motion overruled.)"

It is difficult to determine whether the conversation referred to by the witness on cross-examination was the same as that mentioned by him on direct examination. If it was not, the court [13] correctly ruled that, having been brought out for the first time on cross-examination, the defendant was not in a situation to ask that the testimony be stricken. On the other hand, [14] if there was but one conversation, the record simply discloses that the witness contradicted himself, and the weight to

be given to his entire testimony on the subject was for the jury to determine. The testimony at most only discloses his reason for remaining about the premises, and amounts to no more than a statement that he was told that a game of poker would be played that evening.

6. We find no error in the action of the court in allowing the state's witnesses to testify, over objection, as to "who put up the most money, who lost the most money, and who won the most." This was a matter within the discretion of the court.

7. One ground of the motion for a new trial was that appellant had discovered material evidence which he could not, with reasonable diligence, have discovered and produced at the trial. Two affidavits were filed in support of this feature of the motion. It appears that Lewellen had sworn at the trial that during the progress of the game one "Ole" had served drinks to the players. The affidavit of one Earl Peck declared that he was the person known as "Ole," that he had not been present on the night in question, and that the testimony of Lewellen to the effect that he was present and served drinks was "wholly false and untrue." It will be readily seen that this testimony would have been very material and beneficial to the defendant at the trial. His affidavit, however, instead of disclosing that he exercised reasonable diligence to procure it, does not show that he made any effort whatsoever. It reads, in part, as follows: "That he heard the testimony of the witness Lewellen respecting the presence of one Ole at his said saloon on the night that the game of studhorse poker was alleged to have been played there, and the serving by the said Ole of drinks at the table where the said game was alleged to have been played; that he is well acquainted with the said Ole; that his true name is Earl Peck; that he had no means of knowing and did not know, either at the time of said trial or prior thereto, that the said witness Lewellen would testify as to the presence of said Earl Peck, *alias* Ole, at the time said game was alleged to have been played, or that he served drinks to the players; that the said Earl Peck, *alias* Ole, was not summoned as a witness for the state, and his name did not appear upon either the original information **or**

the amended information, upon which said cause was tried. Affiant further avers that he could not during the course of said trial, by the exercise of reasonable diligence, or at all, have secured the presence at said trial of the said Earl Peck, *alias* Ole, for the reason that affiant was not apprised of the fact that any testimony relative to the said Ole would be introduced at said cause until the same was testified to by the said witness Lewellen.'' The transcript of the testimony shows that the attention of the defendant was directly called to the testimony relating to the presence in the saloon of the person called ''Ole,'' when his counsel interposed an objection to the question, ''Do you know whether or not he served any drinks to outside customers during the time you were playing?'' ' There is nothing in Wakely's affidavit to show that the presence of Peck was not immediately procurable at the trial at the time when Lewellen first mentioned his name, or that any effort was made to secure his testimony.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.